UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Tim Bott and Joy Bott,                                          Civil No. 24-524 (DWF/JFD)

        Plaintiffs,

v.                                                              MEMORANDUM
                                                                OPINION AND ORDER
Robert Gravier, Candy Gravier, and
Allan Block Corporation,

        Defendants.


# INTRODUCTION

This matter is before the Court on Plaintiffs Tim Bott's and Joy Bott's (together, "Plaintiffs" or "the Botts") Motion for a Temporary Restraining Order ("TRO") (Doc. No. 5). Defendants Robert Gravier and Candy Gravier (the "Gravier Defendants") oppose the motion. (Doc. No. 19.) In addition, Allan Block Corporation ("Allan Block") has filed an opposition (Doc. No. 24), but as discussed below there is a dispute over who properly represents Allan Block. For the reasons set forth below, the Court grants the motion in part.

# BACKGROUND

Plaintiffs are minority shareholders in Allan Block, jointly owning approximately 20% of its shares. (Doc. No. 1 ("Compl.") ¶¶ 6, 9, 10.) Tim Bott is the President of Allan Block and on the Board of Directors. (*Id*. ¶ 6.) The Gravier Defendants are the majority shareholders in Allan Block, jointly owning approximately 80% of its shares.

(*Id.* ¶ 10.)  Robert Gravier is the CEO and on the Board of Directors of Allan Block.  (*Id.* ¶ 6.)

Allan Block[1] is in the business of designing and licensing the production of stackable retaining-wall products.  (Doc. No. 9 ("Bott Aff.") ¶ 4; Doc. No. 21 ("Gravier Decl.") ¶ 3.)  Allan Block was founded by Robert Gravier in 1987, at which time a single member Board of Directors was established.  (Bott Aff. ¶¶ 2, 3, Ex. A at § 4.2.)  In 1989, while the general manager of Neff Concrete, Tim Bott entered into a Production Agreement with Allan Block as a licensed producer of the Allan Block system.  (Bott Aff. ¶ 6; Gravier Decl. ¶ 13.)  In 1992, Tim Bott invested in Allan Block in the form of notes with interest tied to the performance of Allan Block.  (Bott Aff. ¶ 7.)  Tim Bott sold his interest in his block manufacturing plant in Illinois and began talking to Allan Block about joining the company.  (*Id.* ¶ 8.)  On January 1, 1994, Tim Bott joined Allan Block, taking on responsibilities of Director of Production.  (*Id.* ¶ 9; Gravier Decl. ¶ 14.)  In 1996, Tim Bott invested additional funds into Allan Block to help the company meet its financial obligations.  (Bott Aff. ¶ 10.)

On March 17, 1997, Tim Bott entered into a Stock Transfer Agreement ("1997 STA") with Allan Block.  (Bott Aff. ¶ 11, Ex. B (the "1997 STA"); Gravier Decl. ¶ 15.)  Under the STA, Tim Bott received approximately 17.5% of the company's outstanding shares (Gravier Decl. ¶ 15) for a price of $120,000 ($5,712.50 per share) plus a note of

---

[1]     Plaintiffs have represented in their briefs and during the hearing that the only claim asserted against Allan Block is the claim for declaratory judgment.  Plaintiffs have agreed to amend the Complaint to reflect the same.

2

$81,377. (Bott Aff. ¶ 11.) An addendum to the STA dated June 10, 1997, provides that Tim Bott jointly owns his shares of Allan Block with his spouse, Joy Bott, and that Robert Gravier jointly owns his shares of Allan Block with his spouse, Candy Gravier. (Bott Aff. ¶ 12, Ex. C.)

Relevant to this case and the present motion, § 10.3 of the 1997 STA provides the following with respect to certain enumerated "Corporate Actions."

> Notwithstanding any present provision of the Bylaws to the contrary and for so long as Bott is alive and continues to be a Shareholder and an employee of the Company, or the Company shall be indebted to Bott, the following actions shall require the written consent of the holders of more than eighty-five percent (85%) of the issued and outstanding Shares of the Company:
>
> (a) Execution or amendment of any employment agreement with any officer of the Company or with any relative, by blood or marriage, of any Shareholder;
>
> . . .
>
> (e) Amendment to the Articles of Incorporation or Bylaws;
>
> . . .
>
> (h) Amendment to [the STA];" [or]
>
> . . .
>
> (j) Distribution of any kind to the Shareholders other than as provided in Section 8.4.

(1997 STA § 10.3.)[2]

---

[2] Gravier maintains that § 10.3 reflects anti-dilution protections meant to shield minority shareholders in a very limited scenario where actions by the majority position could dilute the value of relative share percentages. (Gravier Decl. ¶¶ 16, 17.) Gravier also maintains that this section was not requested by Bott and that it was added solely because it existed in a prior agreement with a prior investor. (*Id.* ¶ 17.) Gravier argues that this anti-dilution provision was not intended to give minority owners control of the Company.

In a written action by the Board of Directors and Shareholders of Allan Block, effective March 17, 1997, Allan Block issued shares to Plaintiffs and expanded the Board of Directors from 1 to 2. (Bott Aff. ¶ 14, Ex. D.) Tim Bott was added to the Board of Directors. (*Id.*) The document is executed by Robert Gravier as Shareholder and Director of Allan Block. (*Id.* at 2.) Pursuant to the document, Robert Gravier was elected President, CEO, and Secretary and Tim Bott as Vice President, CFO, and Treasurer. (*Id.*) The document also authorized the Executive Employment Agreements ("EEA[s]") for Robert Gravier and Tim Bott. (*Id.*)[3]

For roughly the next twenty years, Gravier and Bott worked well together. (Gravier Decl. ¶ 20.) Gravier and Bott purchased Morton's shares, leaving the two of them the sole shareholders of Allan Block. (*Id.* ¶ 21.) Gravier maintains that during this period, they managed the company well and did not need to conduct formal board or shareholder meetings. (*Id.*) Also, between 1997 and 2016, Tim Bott entered into several EEAs. (Bott Aff. ¶ 15.) For example, on March 20, 2007, he entered into an EEA designating him as Vice President and Chief Operating Officer ("COO") of Allan Block and setting his "base salary" at $300,000 per year. (*Id.* ¶ 15, Ex. E (the "2007 EEA").) Attached to the 2007 EEA is a memorandum executed by both Bott and Gravier delineating Bott's duties. (*Id.*)

---

[3] On or about June 4, 1997, Allan Block admitted a new shareholder, John Morton, with whom the parties entered into a new STA. (Gravier Decl. ¶ 18.) Gravier contends that this STA is the operative STA. The Court need not decide that issue because both this STA and the 1997 STA contain materially identical language in § 10.3. (*Compare id.* ¶ 18, Ex. 1 § 10.3 *with* 1997 STA § 10.3.)

4

Plaintiffs allege that after 2007, Robert Gravier spent more time away from the office due to the state of the construction industry and serious health issues. (Bott Aff. ¶ 16.) Plaintiffs also allege that during this time and continuing through 2015, Tim Bott was engaging in heavy travel for work and managing all employees, bookkeeping, and accounting concerns. (*Id.*) In January 2016, Robert Gravier and Tim Bott agreed that Tim Bott would take over control of Allan Block as President. (*Id.* ¶ 18.) On February 2, 2016, Tim Bott entered into a new EEA, noting that Tim Bott was now the President of Allan Block and delineating his duties as such (these duties included "all material business matters including financial, corporate and legal"). (*Id.* ¶¶ 18, 19 & Exs. F (2016 EEA), G (Feb. 1, 2016 Job Description").) The EEA automatically extended annually unless there was "written notice of termination." (2016 EEA at C.3.) Tim Bott's base salary remained the same as his 2007 EEA. (*Compare* Ex. F at 1 *with* Ex. E at 1.) Robert Gravier continued to take compensation and benefits from Allan Block and via a 2018 Addendum to Tim Bott's EEA, Tim Bott was to receive similar compensation and benefits after he left Allan Block. (Bott Aff. ¶ 23 & Ex. H.)

Robert Gravier submits that he began to experience serious health problems that restricted his ability to travel in 2013. (Gravier Decl. ¶ 22.) In 2016, Gravier had to step back from day-to-day activities at Allan Block. (*Id.*) Gravier contents that he and Bott agreed that Gravier would work more as an outside consultant until his health improved. (*Id.* ¶ 23.) In addition, Gravier would continue to serve as CEO, and director, and help set Allan Block's budget, general goals, and general business plans, plus focus on specific projects that would not require travel or be in the office day-to-day, while Bott

would assume the role as President and various day-to-day responsibilities that Gravier had previously performed for Allan Block. (*Id*.) Gravier also asserts that his health problems prevented him from completing as many outside projects as he had hoped, and that Bott expressed frustration that Gravier continued to receive compensation and benefits from the company. (Gravier Decl. ¶ 26.) Because of that frustration, Bott insisted that he receive commensurate compensation and benefits from Allan Block if Allan Block were sold or Bott were to retire. (*Id*.) Because Gravier was unable, at that point in time, to return to Allan Block and Allan Block had become dependent on Bott's involvement, Gravier agreed to Bott's demand. (*Id*.) Thus, for this reason Gravier asserts that the Addendum discussed above was executed.

Also in January 2016, Robert Gravier and Tim Bott agreed to explore selling Allan Block. (Bott Aff. ¶ 24.)[4] They adopted a five-year plan to reach the goal of selling the company to a third party. (*Id*.) Plaintiffs assert that Tim Bott worked to prepare the company for sale, but Robert Gravier dragged his feet and failed to take agreed upon steps to facilitate a sale. (*Id*. ¶ 25.) In 2022, Allan Block hired Bill Holden, a consultant to advise the company regarding a potential sale. (*Id*. ¶ 26.) Holden advised them what Allan Block could expect from a potential sale as a multiple of its existing profit. (*Id*.)

Robert Gravier submits that over time his health improved, but that in his absence, Bott had assumed a greater role with Allan Block, such that Gravier was concerned that the Company was too dependent on Bott. (Gravier Decl. ¶ 28.) Gravier encouraged Bott

---

[4] Gravier asserts that these plans and Bott's new responsibilities focused on cooperating in efforts relating to a potential sale, are reflected in the new EEA.

to delegate work to other employees but claims that Bott refused. (*Id*.) Gravier thought this created unnecessary risks for the business, including to its potential sale. (*Id*.) Bott disputes that he refused to delegate and, instead, insists that he attempted to pass off duties. (Doc. No. 27 ("Second Bott. Aff.") ¶ 22.)

In 2020, after the initial onset of the COVID-19 pandemic, Bott began discussing his possible retirement. (*Id*. ¶ 29.) Gravier saw this as an issue because Bott continued to handle many aspects of the business and was working almost exclusively from his home in Hilton Head, South Carolina. (*Id*.) On October 5, 2020, Bott sent Gravier a memorandum regarding his employment and long-term plans. (*Id*. ¶ 30 & Ex. 5.) This plan was intended to transition more of the company's responsibilities to subordinates and better the position the company to be sold. (Second Bott. Aff. ¶ 19.) The plan recognized that Bott did not intent to work forever and the ages of the two owners. (*Id*.) The plan, however, was quickly derailed by the loss of two young managers. (*Id*. ¶¶ 20-21.)

Plaintiffs allege that beginning in 2023, Robert Gravier began making decisions that were contrary to the 1997 STA and 2016 EEA. First, Robert Gravier notified Tim Bott (both via an email and through Holden as an agent for Robert Gravier) that he was going to terminate and amend Tim Bott's employment status. (Bott Aff. ¶¶ 27, 28.) Tim Bott maintains that this effort was explicitly contrary to the 1997 STA (requiring 85% of the outstanding shares to amend an employment agreement with any officer). Tim Bott objected and continued in his responsibilities as President of Allan Block. (*Id*. ¶ 29.)

Second, on February 7, 2024, Robert Gravier decided to hold a formal shareholder and board of director meeting for the first time in 27 years. (Bott Aff. ¶ 30.) Prior to the meeting, Tim Bott and Robert Gravier communicated through counsel. Disputed issues included Robert Gravier's proposals to expand the Board of Directors to include Holden and to expand Robert Gravier's CEO duties to take over some duties assigned to Tim Bott as President. (Doc. No. 10 ("Briol Aff.") ¶ 3 & Ex. N *with* Bott Aff. Ex. G.) Again, Tim Bott maintains that these proposals, which would remove Tim Bott's responsibility for "material financial, corporate, and legal decisions" were explicitly contrary to the 1997 STA.

At the February 7, 2024 meeting, Plaintiffs voted against the proposal to expand the Board of Directors from 2 to 3, invoking § 10.3 of the 1997 STA (requiring 85% of the outstanding shares). (Bott Aff. ¶ 32.) Robert Gravier voted Candy Gravier's shares by proxy, and their combined shares voting for the proposal totaled approximately 80% of the outstanding shares. (*Id*.) Despite not reaching the 85%, Robert Gravier proceeded to appoint Bill Holden as a new member of the Board of Directors. (*Id*.) Plaintiffs voted against Holden's appointment but Robert Gravier determined that the matter was decided that Holden was now on the Board and adjourned the meeting. (*Id*.) With Holden as a purported new member of the Board, Robert Gravier continued with his agenda, getting approval from himself and Holden, despite the objection of Tim Bott. (*Id*. ¶ 34.) For example, Robert Gravier and Holden authorized an EEA for Gravier that game him responsibilities for financial, corporate and legal decisions for Allan Block.

8

Plaintiffs also submit that Robert Gravier engaged in various "legal shenanigans." These include retaining the law firm of Fredrickson & Byron, P.A. (which had done legal work for Allan Block) as early as August 2023 to change Allan Block's corporate structure. (*Id.* ¶ 35.) Plaintiffs maintain that the legal work was not authorized by Allan Block or Tim Bott (who was responsible for legal matters). Also, on January 22, 2024, Robert Gravier's counsel sent a "cease and desist" letter to Tim Bott's counsel, seeking to stop the disclosure of information contained in the "President's Report" to Allan Block's corporate bank. (Bott Aff. ¶¶ 36, 37 & Exs. I (the "cease-and-desist"), J (the "President's Report".)[5] Plaintiffs maintain that the information in the President's Report is accurate and that Robert Gravier was attempting to obstruct accurate financial reporting. Plaintiffs also assert that, in the same vein, Robert Gravier attempted to block disclosure of the financial information to Allan Block's accountants. (Bott Aff. ¶ 39 & Ex. J.)

On February 19, 2024, Plaintiffs filed this action, asserting the following causes of action: Breach of Contract (Count I); Violation of Minn. Stat. § 302A.751 (Count II); Breach of Duty of Loyalty (Count III); Breach of Duty of Good Faith and Fair Dealing

---

[5]   Tim Bott asserts that the Presidents Report is one vehicle used by Bott to communicate the true state of company's finances to its bank after Allan Block was unable to make payments on a loan. (Second Bott Aff. ¶ 6.) More generally, Bott contends that when he joined Allan Block in 2024, its "financial house [] was a complete disaster" and that he was tasked with reaching a resolution with the bank. (*Id.*)

9

(Count IV); Declaratory Judgment (Count XX); Temporary Injunction (Count IX).[6] Plaintiffs also filed a motion for a TRO, which is presently before the Court.

The parties also dispute who is the proper counsel of record for Allan Block. After initiating this action, Plaintiffs served the Complaint and TRO on Allan Block through counsel for the Graviers. (Doc. No. 11 ("Aff. of Service").) On the same day of service, attorneys from the law firm of Thom Ellingson PLLP noticed their appearance as counsel for Allan Block. (Doc. No. 12.) The Graviers did not consent to the hiring of Thom Ellingson PLLP as counsel for Allan Block. (Gravier Decl. ¶ 94.) The Graviers have purportedly engaged counsel from Madel P.A. to represent Allan Block, based on the approval of 81.08% of the shareholders (the Graviers) and two of the three members of the Board of Directors (Robert Gravier and Bill Holden). (*Id.* ¶ 96.) Counsel from Madel P.A. noted their appearance on behalf of Allan Block on February 28, 2024 (Doc. Nos. 14 & 15) and filed an objection to the pending motion for a TRO (Doc. No. 24).

## DISCUSSION

### I. Temporary Restraining Order

In considering whether to grant a TRO or preliminary injunction, the Court looks to four primary factors: (1) the likelihood of the moving party's success on the merits; (2) the threat of irreparable harm to the moving party; (3) the state of balance between the alleged irreparable harm and the harm that granting the injunction would inflict on the

---

[6] It appears that Counts XX and IX were misnumbered and should be Counts V and VI, respectively. Even so, the Court refers to the counts as they are numbered in the Complaint to avoid any confusion.

other party; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). This analysis was designed to determine whether the Court should intervene to preserve the status quo until it decides the merits of the case. *Id*. The factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *See West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). The burden of establishing the propriety of a TRO is on the movant. *See Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### A.  Irreparable Harm

The Court first considers whether there is a threat of irreparable harm to the movant. "[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (internal quotations and citation omitted). "When there is an adequate remedy at law, a preliminary injunction is not appropriate." *Watkins*, 346 F.3d at 844.

Plaintiffs assert that they will be irreparably harmed absent a TRO. In particular, Plaintiffs argue that Robert Gravier's recent attempts to alter the corporate structure of Allan Block reflects an effort to seize control of "financial, corporate and legal" decisions despite Plaintiffs' rights and the fact that Tim Bott has been performing those duties under his current EEA for years. Plaintiffs further argue that those efforts risk reputational harm to Allan Block and potential lost business opportunities that will

11

directly affect the value of Plaintiffs' ownership in Allan Block that could not be remedied through financial compensation.

The Court agrees. The record shows that Tim Bott has been President of Allan Block for eight years and that Allan Block has had a two-person Board of Directors for twenty-seven years. As President, Tim Bott's duties include responsibility for "all material matters, including financial, corporate and legal." The record also shows that in exercising those duties, Tim Bott has been effective. The Gravier Defendants' attempt to alter Allan Block's corporate structure without obtaining the required support of shareholders so as to diminish Tim Bott's role as President creates a risk to the reputation of the company, lost business opportunities, and a dilution to the value of Plaintiffs' ownership in the company. The Court concludes that there is a threat of irreparable harm absent the preservation of the status quo.

      **B.**      **Likelihood of Success on the Merits**

            **1.**      **Breach of Contract**

To prevail on a breach of contract claim, Plaintiffs must demonstrate: (1) the formation of a contract; (2) the performance of the conditions precedent; and (3) a breach. *See Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008).

At issue here are two contracts—the 1997 STA and Tim Bott's 2016 EEA, including the February 1, 2016 Job Description. There is no dispute regarding the formation of the two contracts and that Tim Bott performed the conditions precedent. The dispute is whether the Gravier Defendants breached the contracts.

After considering the record and arguments of the parties, the Court concludes that Tim Bott is likely to prevail in showing that the Gravier Defendants breached § 10.3 of the 1997 STA by taking various corporate actions without obtaining the required consent of 85% of the voting shares. First, Plaintiffs will likely succeed in showing that the Gravier Defendants breached § 10.3 by increasing the size of the Board of Directors without the required consent. Plaintiffs submit that because the size of the Board of Directors is governed by the company Bylaws, any increase in the size amounts to an amendment to the Bylaws and therefore falls within the consent requirements of § 10.3. Defendants argue that an increase in the size of the Board of Directors is permitted via resolution of the majority vote of the shareholders based on language in the Bylaws. Specifically, Defendants point to § 4.2 that provides in part, "[u]ntil further action of the Board of Directors, the number of directors of the corporation shall be one (1)" and providing that the number of directors "shall be determined from time to time by resolution of the shareholders." (Bott Aff. ¶ 3, Ex. A at § 4.2.) The Gravier Defendants argue that this language suggests that changes to the size of the Board can be made without amending the Bylaws and therefore that a simple majority vote of the shareholders is permitted. The Court is not persuaded that the Gravier Defendants' reading of the contractual language will prevail. Instead, the likely reading of that language is that while shareholders can change the size of the Board, their power to do so is restricted by the written consent (85% of the shareholders) requirement under § 10.3.

Second, Plaintiffs will likely succeed in showing that the Gravier Defendants breached § 10.3 by adding Holden the Board of Directors without achieving the written

13

consent of 85% of the shareholders. Because Plaintiffs are likely to succeed in showing that the Graviers needed the consent of 85% of the shareholders to add a seat to the Board, they similarly could not add Holden without obtaining that approval. Moreover, even if there were a "vacancy" to fill, the Bylaws provide that any such vacancy "be filled by the affirmative vote of a majority of remaining directors." (*Id*. at § 4.12.) No such vote was attained.

Third, Plaintiffs are likely to succeed in showing that the Gravier Defendants' actions that resulted in an amendment to the terms of Tim Bott's 2016 EEA (by transferring his responsibilities for material financial, corporate and legal decisions to Robert Gravier) violated § 10.3. Section 10.3 expressly states that the "amendment of any employment agreement with any officer of the Company" requires the written consent of 85% of the shareholders.

In short, Plaintiffs are likely to succeed in showing that in taking the above three corporate actions without obtaining the required consent of 85% of the voting shares, the Gravier Defendants breached the 1997 STA. In addition, in attempting to transfer the responsibilities over material corporate, legal, and financial decisions to Robert Gravier, it is likely that they also breached Tim Bott's 2016 EEA.

For the above reasons, the Court finds that this factor weighs in favor of granting a temporary restraining order to preserve the status quo.[7]

---

[7] Plaintiffs argue that they are also likely to succeed on their claims under § 302A.751, and for breaches of the duty of loyalty and the duty of good faith and fair dealing. For each of these claims, Plaintiffs assert that the Graviers have acted in a manner that is unfairly prejudicial towards them in eight specific ways: (1) attempting to

14

**2.     Declaratory Judgment**

In the claim for declaratory judgment, Plaintiffs ask the Court to issue an declaratory judgment that the Graviers' attempts were not legally effective in (a) changing the corporate structure of Allan Block (from 2 members of the Board of Directors to 3); (b) adding Bill Holden to the Board of Directors; (c) assigning responsibility for material financial, corporate and legal decisions to Robert Gravier; and (d) authorizing an Executive Employment Agreement for Robert Gravier.

As discussed above, the Court concludes that Plaintiffs are likely to succeed on their claim that the Graviers' actions breached the terms of the 1997 STA and 2016 EEA. Accordingly, the are likely to succeed in the corresponding claim for declaratory judgment.

---

terminate the effective incumbent President of Allan Block; (2) ignoring the contractual relationship between the shareholders in expanding the size of the board of directors; (3) appointing a new member to the board of directors who was not impartial, but rather friendly to Defendants and had been part of Defendants' prior attempts to improperly terminate Tim Bott; (4) ignoring the contractual relationship between the shareholders in attempting to assign roles in the management of the company previously assigned to Tim Bott despite his effective performance of those roles, including "corporate, legal and financial decisions;" (5) ignoring the contractual relationship between the shareholders in attempting to compensate Defendants financially for duties that had previously been assigned to Tim Bott without additional compensation; (6) retaining Allan Block's attorneys in an attempt to benefit Defendants, change the Allan Block corporate structure, and terminate Tim Bott and then have the legal invoices for this improper legal work sent to Allan Block for payment; (7) having a cease-and-desist letter sent to Tim Bott as President of Allan Block attempting to stop dissemination of accurate information contained in the President's letter for Robert Gravier's personal financial benefit; and (8) attempting to obstruct accurate financial reporting to Allan Block's accountants for its Audited Financial Statements.  Because the Court has already determined that Plaintiffs are likely to succeed on their breach of contract claim, the Court declines to consider the alternative bases for the temporary restraining order.

### C. Balance of the Equities

The Court must next determine whether the balance of the equities favors an Injunction. "In balancing the equities, [the Court] weigh[s] the threat of irreparable harm shown by the movant against the injury that granting the injunction will inflict on other parties." *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (internal quotations and citation omitted).

Plaintiffs submit that, for the reasons outlined above, they will suffer irreparable harm if Robert Gravier is permitted to control the financial, corporate and legal decisions of Allan Block. In contrast, Plaintiffs argue that any harm to Defendants in granting an injunction would be minimal. Plaintiffs point out that the Board of Directors for Allan Block has remained unchanged for 27 years, Tim Bott has faithfully performed his duties as President of Allan Block since 2016, and that his tenure has resulted in some of the most profitable years for Allan Block. Plaintiffs stress that the TRO will simply preserve the status quo without harm to Defendants while the lawsuit proceeds.

The Court concludes that when balancing the equities, this factor favors granting the requested injunctive relief.

### D. Public Interest

The public has a strong interest in seeing that contract rights are respected. *See, e.g.*, *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) (explaining that "the public interest calls for the[] enforcement" of valid contracts). Here, the public interest is served by enforcing 1997 STA and 2016 EEA.

### E. Bond

The Court must also consider a bond. Rule 65(c) of the Federal Rules of Civil Procedure requires the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." As the Court explained above, the temporary injunctive relief granted herein serves to protect the status quo of the parties and will not cause harm to Defendants. Therefore, the Court finds no bond is required.

## II. Retention of Attorney for Allan Block

In light of the Court's decision to preserve the status quo pending a decision on a future motion for a preliminary injunction or a stipulation of the parties to continue the TRO until a final adjudication in this case, that status quo leaves Tim Bott responsible for "all material business matters including financial, corporate and legal decisions." Accordingly, the Court finds that Tim Bott's retention of counsel on behalf of Allan Block governs.

## CONCLUSION

The Court concludes that temporary injunctive relief if warranted, insofar as Plaintiffs are likely to succeed on their breach of contract claims and will suffer irreparable harm without the relief. In addition, the Court finds that any harm to the Defendants in issuing the relief will be minimal and the public interest weighs in favor of granting the requested relief. As such, the Court grants the motion in part and concludes that the Gravier Defendants are properly restrained from taking the following actions until the Court considers a motion for a preliminary injunction or, per the stipulation of

the parties, until the case is finally adjudicated on the merits: (a) terminating the EEA of President Tim Bott; (b) expanding the size of the board of directors or appointing Bill Holden to the Board; and (c) assigning responsibility for material financial, corporate, and legal decisions to Robert Gravier.

The Court continues to believe that not only would the Botts and the Graviers benefit from the neutral assistance of a magistrate judge to make a serious attempt to settle this matter, but such efforts would also benefit Allan Block Corporation. If the parties agree, they can reach the Chambers of Magistrate Judge John F. Docherty at 651-848-1180.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for a TRO (Doc. No. Plaintiff's Complaint (Doc. No. [5]) is **GRANTED IN PART** such that the Graviers, their agents, servants, employees, and attorneys, and any other person who is in active concert or participation with them, are restrained from the following:

    (a) terminating the 2016 EEA of President Tim Bott;

    (b) expanding the size of the Board of Directors of Allan Block or appointing Bill Holden to the Board of Directors; and

    (c) assigning responsibility for financial, corporate, and legal decisions to Robert Gravier.

2. This Temporary Restraining Order shall remain in place until a decision of this Court on a Preliminary Injunction motion or stipulation of the parties to continue the TRO until a final adjudication in this case.

3. No bond is required.

Dated: March 22, 2024                                    s/Donovan W. Frank
                                                         DONOVAN W. FRANK
                                                         United States District Judge